IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEON V. LIPSCOMB, <br><br>    Plaintiff, <br><br> v. <br><br> JILIAN CRANE, TERA WILKES, and LANCE KORANDO,[1] <br><br>    Defendants. | Case No. 23-cv-2800-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Keon V. Lipscomb, an inmate of the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Pontiac Correctional Center, brings this action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights while at Menard Correctional Center. Lipscomb's Complaint alleges that Defendants failed to protect him, were deliberately indifferent to his intent to self-harm, and acted with deliberate indifference to his need for medical care, all in violation of the Eighth Amendment.

This matter is before the Court on motions for summary filed by Jilian Crane, Tera Wilkes, and Lance Korando (Docs. 40, 41 and 43, 44). Defendants argue that Lipscomb failed to exhaust his administrative remedies prior to filing his lawsuit. Lipscomb filed a timely response (Doc. 47) to the motions (Doc. 47) and recently filed an updated response

---

[1] Lance Korando has identified himself by his proper name. The Clerk of Court is DIRECTED to correct the docket to reflect Korando's proper name.

1

(Doc. 52). On February 6, 2025, the Court held an evidentiary hearing pursuant to *Pavey v. Conley*, 544 F.3d 739, 740-41(7th Cir. 2008).

## BACKGROUND

### A. Procedural Background

Lipscomb's claims stem from a hunger strike which he began on July 10, 2023, to protest his lack of medical and mental health treatment (Doc. 1; Doc. 13, p. 2). On July 14, 2023, despite being on a hunger strike, a correctional officer gave Lipscomb a food tray. In response to receiving the tray, Lipscomb self-mutilated (Doc. 13, p. 2). He was subsequently placed on crisis watch (*Id.*).

On August 6, 2023, Lipscomb began feeling weak and dizzy (*Id.* at p. 3). He informed Lance Korando that he had not eaten breakfast and was no longer on a hunger strike (*Id.*). He also asked to see a nurse (*Id.*). But Korando refused Lipscomb's requests and instead suggested that Lipscomb should kill himself with a staple that was near his cell door (*Id.*). Lipscomb retrieved the staple and later cut his arm, hitting an artery (*Id.*). He was taken to a local hospital for treatment (*Id.*).

Upon Lipscomb's return to the prison, Nurse Practitioner Jilian Crane refused to admit him to the healthcare unit for closer observation (Doc. 13, p. 3). Lipscomb alleges that Jilian Crane kept him in the cellhouse, despite being on a hunger strike for an extended period of time (*Id.* at p. 8). Lipscomb later informed Tera Wilkes, a mental health staff member, about the August 6 incident. Wilkes indicated that she was aware that the officer gave Lipscomb the staple, but she did not interfere because she did not like him and hoped that he died (*Id.* at pp. 3-4, 11). She also informed him that security would now

2

attend his mental health meetings, an act Lipscomb argued was in violation of the Health Insurance Portability and Accountability Act ("HIPAA") (*Id*.).

After review of Lipscomb's Complaint pursuant to 28 U.S.C. § 1915A, he was allowed to proceed on the following two counts:

> Count 2:   Eighth Amendment deliberate indifference claim against Jilian Crane for denying Lipscomb access to medical care while on a hunger strike.
>
> Count 3:   Eighth Amendment failure to protect and deliberate indifference claim against Lance Korando and Tera Wilkes for failing to stop Lipscomb from self-harming.

(Doc. 13, p. 4).

Defendants Jilian Crane and Tera Wilkes (Docs. 40, 41), as well as Lance Korando (Docs. 43, 44), filed motions for summary judgment arguing that Lipscomb failed to exhaust his administrative remedies prior to filing his lawsuit. Ryan Nothnagle, current chairperson of the Administrative Review Board ("ARB"), submitted an affidavit stating that he did not receive any grievances that were submitted by Lipscomb between July 10, 2023, and August 15, 2023 (the date Lipscomb filed his Complaint in this case) (Doc. 44-2, p. 3; Docs. 41-1, 41-2).

Lipscomb did, however, submit three grievances *after* he filed his Complaint. On August 20, 2023, Lipscomb submitted a grievance (#569-8-23) about the August 6 self-harm incident (Doc. 41-2, pp. 20-21). The grievance mentioned Wilkes and Crane and referred to the correctional officer involved in the incident (later identified by Lipscomb as Korando) (*Id*. at p. 21). Lipscomb noted in the grievance that he already filed a lawsuit about his complaints, but only because he had not received grievance forms from prison

3

staff since April 7, 2023 (*Id*. at p. 20). Although he sought to file a grievance on his issues while on hunger strike prior to his lawsuit, Lipscomb noted that officials denied that they had any grievance forms to give to him. After he filed his Complaint, he received grievance forms. The grievance noted his belief that Menard's "litigation personnel" read his Complaint and gave him a grievance form (*Id*. at p. 21).

Lipscomb submitted another grievance on August 25, 2023 (Doc. 41-3, p. 4). According to the grievance log, the grievance (#625-8-23) was about staff conduct, medical, and mental health treatment (*Id*. at p. 5). This grievance was deemed not an emergency and returned to Lipscomb (*Id*.). There is no further record of this grievance. An August 29, 2023 grievance (#700-8-23) from Lipscomb complained that he was denied mental health services after filing his lawsuit (Doc. 41-2, pp. 13-14). This grievance also mentioned Wilkes's refusal to follow HIPAA requirements (*Id*. at p. 14).

Lipscomb argued in his response that he could not file these grievances prior to filing his lawsuit because he did not have access to grievance forms. His August 20, 2023 grievance indicated that he did not have access to grievance forms until after he filed his lawsuit (Doc. 41-2, p. 20). His grievance specifically stated that staff told him that they did not have any forms to give him. Lipscomb also argued that he spoke to his counselor, Leah Strong, about his need for grievance forms and she informed him that the copy machine was broken, and grievance forms were not available (Doc. 47, p. 1, 7). In response to Lipscomb's August 20 grievance regarding lack of grievance forms, the grievance officer noted that grievance forms were usually in the cell house and available upon request (Doc. 41-2, p. 18). But the grievance officer acknowledged that during the relevant

4

time frame it "was [the] end of the fiscal year" (*Id*. at p. 18). The grievance officer explained that when supplies run low, the business officer must request more funding and "that is a process that can take time…due to legal issues surrounding procurement." (*Id*.).

Lipscomb also argued in a supplemental response that he was on crisis watch at the time and was not allowed access to a pen or paper (Doc. 52, pp. 1-2, 7). Lipscomb pointed to entries in his cumulative counseling summary from another time when he was on crisis watch to support his argument. On March 7, 2024, while on crisis watch, he asked Strong about writing a grievance while on crisis watch (*Id*. at p. 5). He specifically informed her that staff told him that if he wanted to write a grievance, staff would pull him out of his cell and Strong would write the grievance with him (*Id*.). Strong responded that she was not aware of the policy but would inquire about his ability to write a grievance on crisis watch (*Id*.). Later that same day, an unknown staff member noted in the counseling summary that Lipscomb had requested to write a grievance but was not allowed pen and paper while on crisis watch (*Id*.). The note indicated that a law library clerk was sent to the cellhouse and assisted Lipscomb in filling out a grievance (*Id*.). On March 20, 2024, Lipscomb again asked Strong to provide him with a helper to write his grievance while on crisis watch (*Id*. at p. 6). The summary failed to note Strong's response. He similarly requested help to write a grievance on May 10 and May 16, 2024 (*Id*. at p. 7).

### B. Evidentiary Hearing

At the February 6 evidentiary hearing, the Court heard testimony from Lipscomb and Leah Strong.

1. *Lipscomb*

Lipscomb testified as to his ability to submit grievances while on crisis watch. He noted that during this time he was not allowed to have grievance forms or any property, even his clothes. The only thing he could do to file a grievance was to ask somebody to help him write the grievance. Lipscomb testified that he asked Leah Strong, his counselor, as well as mental health staff, to help him file a grievance. Lipscomb testified that he first started asking Strong for help with a grievance after he came back from the hospital and while on suicide watch. He testified that Strong wrote down his requests and noted that she would try to figure out how Lipscomb could write a grievance while on suicide watch. But Lipscomb later acknowledged that he was talking about interactions with Strong that took place in 2024, well after the events in July and August 2023. He admitted that he gets confused about dates.

Lipscomb also testified that his issues with Crane and Wilkes began before his return from the hospital on August 6, 2023. He was not able to see a doctor or nurse and was unable to receive any medical treatment while on hunger strike and then suicide watch. Lipscomb indicated that his grievance was written after he returned from the hospital in August. He insisted that grievances were not available to him during July and early August 2023. He also requested help with grievances from Mental Health Professional Connor while on suicide watch. But he could not recall when he asked her for help.

Lipscomb also acknowledged that in response to a grievance submitted by Lipscomb on July 6, 2023, the counselor and grievance officer noted that money vouchers

6

were limited due to a paper shortage at the end of the year (Doc. 47, pp. 16-17). Lipscomb wrote in his own handwriting out to the side of the response that the paper shortage included grievances (*Id.*). But Lipscomb testified that he was told the copy machine was broken and there was a paper shortage. He testified that the counselor told him he could not have a grievance because the prison did not have any.

   2. *Leah Strong*

Leah Strong, a counselor at Menard, testified about her interactions with Lipscomb between July 10 and August 15, 2023. Strong testified that Lipscomb was able to receive grievance forms. She also testified that there was never any issue with the copy machine or obtaining paper for grievances. She noted that there are several copy machines throughout the prison and staff can print grievance forms. She did acknowledge that the prison often experiences paper shortages towards the end of the fiscal year, but those shortages do not affect grievances. The prison does sometimes run out of money vouchers, but the grievances are printed on 8 ½ by 14-inch paper rather than the normal 8 ½ by 11-inch paper. The smaller paper type is the one that usually experiences shortages, but the prison always has the larger type for grievances.

Strong also acknowledged that inmates on crisis watch are not allowed pens due to the risk of self-harm, but inmates still have access to the grievance process. Strong testified that either a counselor or an individual from mental health can write the grievance for the inmate. She noted that Lipscomb utilized this process in the past to submit grievances while on crisis watch. Strong noted that she was not able to write grievances for Lipscomb because he had previously acted inappropriately towards

7

female officials, but that a male counselor was made available to Lipscomb for grievances. Lipscomb would ask to write a grievance, Strong would note his request and contact her supervisor. A male counselor then would be sent to the cellhouse to draft the grievance. Strong noted that she had several grievances from Lipscomb ranging from July 2023 through December 2023.

Strong acknowledged that the very first time she was approached by Lipscomb on suicide watch asking about a grievance she did have to speak with her supervisor, and then they had a male counselor help Lipscomb write the grievance he wanted to submit. She did not recall exactly when he asked for help or how many times but noted that it would be in her notes. After reviewing her notes, Strong noted that there was no indication in her notes that Lipscomb asked for help writing grievances in 2023.

## LEGAL STANDARDS

"Summary judgment is proper if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact such that [the defendant] is entitled to judgment as a matter of law." *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010). Lawsuits filed by inmates are governed by the provisions of the Prison Litigation Reform Act ("PLRA"). 42 U.S.C. §1997e(a). That statute states, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id*. The Seventh Circuit requires strict adherence to the PLRA's exhaustion requirement. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (noting that "[t]his circuit has taken a

8

strict compliance approach to exhaustion"). Exhaustion must occur before the suit is filed. *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004). A plaintiff cannot file suit and then exhaust his administrative remedies while the suit is pending. *Id.* Moreover, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2005). Consequently, if a prisoner fails to properly utilize a prison's grievance process, "the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted." *Dole*, 438 F.3d at 809.

Under *Pavey v. Conley*, 544 F.3d 739, 740-41 (7th Cir. 2008), the Seventh Circuit held that "debatable factual issues relating to the defense of failure to exhaust administrative remedies" are not required to be decided by a jury but are to be determined by the judge. Thus, where failure to exhaust administrative remedies is raised as an affirmative defense, the Seventh Circuit set forth the following recommendations:

> The sequence to be followed in a case in which exhaustion is contested is therefore as follows: (1) The district judge conducts a hearing on exhaustion and permits whatever discovery relating to exhaustion he deems appropriate. (2) If the judge determines that the prisoner did not exhaust his administrative remedies, the judge will then determine whether (a) the plaintiff has failed to exhaust his administrative remedies, and so he must go back and exhaust; (b) or, although he has no unexhausted administrative remedies, the failure to exhaust was innocent (as where prison officials prevent a prisoner from exhausting his remedies), and so he must be given another chance to exhaust (provided that there exist remedies that he will be permitted by the prison authorities to exhaust, so that he's not just being given a runaround); or (c) the failure to exhaust was the prisoner's fault, in which event the case is over. (3) If and when the judge determines that the prisoner has properly exhausted his administrative remedies, the case will proceed to pretrial discovery, and if necessary a trial, on the merits; and if there is a jury trial, the jury will make all necessary findings of fact without being bound by (or even informed of) any of the findings made by the

>district judge in determining that the prisoner had exhausted his administrative remedies.

*Id.* at 742.

### A. Illinois Exhaustion Requirements

As an IDOC inmate, Lipscomb was required to follow the regulations contained in IDOC's Grievance Procedures for Offenders ("grievance procedures") to properly exhaust his claim. 20 Ill. Administrative Code §504.800 *et seq*. The grievance procedures first require inmates to file their grievance with the counselor within 60 days of the discovery of an incident. 20 Ill. Admin. Code §504.810(a). The grievance form must:

>contain factual details regarding each aspect of the offender's complaint, including what happened, when, where and the name of each person who is the subject of or who is otherwise involved in the complaint. This provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible.

20 Ill. Admin. Code §504.810(c). Grievances that are unable to be resolved through routine channels are then sent to the grievance officer. 20 Ill. Admin. Code §504.820(a). The Grievance Officer will review the grievance and provide a written response to the inmate. 20 Ill. Admin. Code §504.830(a). "The Grievance Officer shall consider the grievance and report his or her findings and recommendations in writing to the Chief Administrative Officer ["CAO"] within two months after receipt of the grievance, when reasonably feasible under the circumstances." 20 Ill. Admin. Code §504.830(e). "The [CAO] shall review the findings and recommendation and advise the offender of his or her decision in writing." *Id.*

If the inmate is not satisfied with the CAO's response, he or she can file an appeal with the Director through the ARB. The grievance procedures specifically state, "[i]f, after receiving the response of the Chief Administrative Officer, the offender still believes that the problem, complaint or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director. The appeal must be received by the Administrative Review Board within 30 days after the date of the decision." 20 Ill. Admin. Code §504.850(a). The inmate shall attach copies of the Grievance Officer's report and the CAO's decision to his appeal. *Id.* "The Administrative Review Board shall submit to the Director a written report of its findings and recommendations." 20 Ill. Admin. Code §504.850(d). "The Director shall review the findings and recommendations of the Board and make a final determination of the grievance within six months after receipt of the appealed grievance, when reasonably feasible under the circumstances. The offender shall be sent a copy of the Director's decision." 20 Ill. Admin. Code §504.850(e).

The grievance procedures allow for an inmate to file an emergency grievance. In order to file an emergency grievance, the inmate must forward the grievance directly to the CAO who may "[determine] that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the offender" and thus the grievance should be handled on an emergency basis. 20 Ill. Admin. Code §504.840(a). If the CAO determines the grievance should be handled on an emergency basis, then the CAO "shall expedite processing of the grievance and respond to the offender" indicating to him what action shall be taken. 20 Ill. Admin. Code §504.840(b). If the CAO determines the grievances "should not be handled on an emergency basis, the offender shall be notified

11

in writing that he or she may resubmit the grievance as non-emergent, in accordance with the standard grievance process." 20 Ill. Admin. Code §504.840(c). When an inmate appeals a grievance deemed by the CAO to be an emergency, "the Administrative Review Board shall expedite processing of the grievance." 20 Ill. Admin. Code §504.850(f).

## ANALYSIS

Simply put, the Court finds that Lipscomb failed to exhaust his administrative remedies. Lipscomb acknowledges that he did not file any grievances related to his claims until after he filed his Complaint. Instead, Lipscomb argues that he asked to file grievances, but he was on crisis watch without access to forms, and that he was told there were no grievance forms available. If true, then he would have been thwarted in his attempts to exhaust his claims. *Ross v. Blake*, 578 U.S. 632, 644 (2016) (Administrative remedies can be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process."). *See also Walker v. Sheahan*, 526 F.3d 973, 979 (7th Cir. 2008); *Dole*, 438 F.3d at 809. But Lipscomb's testimony regarding his inability to file grievances lacks credibility. Lipscomb argued in his brief that he lacked access to grievance forms because it was the end of the fiscal year and there was a paper shortage. His August 20, 2023 grievance noted that grievance forms were not available to him to submit an earlier grievance (Doc. 41-2, p. 21). Lipscomb also pointed to a response to his July 6, 2023 grievance where the grievance office noted that due to it being the end of the fiscal year, there was a paper shortage for money vouchers (Doc. 47, p. 16).

Although Lipscomb argues that there were no grievance forms due to a paper shortage, his purported evidence fails to support his claims. The response to Lipscomb's

12

July 6 grievance notes that due to a paper shortage, there were delays in "money vouchers" reaching inmates. The response specially notes that "vouchers were not readily available" (Doc. 47, p. 16). Although there is a handwritten note out to the side of the response indicating that the paper shortage included grievances, Lipscomb testified that he wrote the note about the grievance shortage. In responding to his grievance, neither the counselor nor the grievance officer noted a shortage of grievance forms. Further, Counselor Leah Strong testified that shortages in paper were for 8 ½ by 11-inch standard paper that were used for other prints such as money vouchers. Grievance forms, however, were printed on larger paper. Strong testified that the prison never ran out of the larger paper for grievance forms, and grievances were readily available to inmates. She also testified that there were several copy machines at the prison and a single broken printer would not prevent officials from obtaining grievance forms for inmates. Lipscomb's contention that there was a grievance shortage, and he did not have access to grievances, is simply not supported by the evidence.

Lipscomb also argues that he requested help with writing his grievances but that Strong did not originally know how Lipscomb could submit a grievance while on crisis watch. He testified at the evidentiary hearing that he requested help after returning from the hospital but Strong had to make an inquiry regarding Lipscomb's ability to write a grievance while on crisis watch. Lipscomb clearly confused his dates. The records he points to in support of his argument are from March 2024, well after the events at issue in this lawsuit took place (Doc. 52, p. 5). Lipscomb further acknowledged at the evidentiary hearing that he gets confused about the dates related to his claims. Further,

13

Strong testified that she did not see any requests for help in submitting a grievance from Lipscomb in 2023. She also acknowledged that it was not until 2024 when Lipscomb first inquired about having assistance submitting a grievance while on crisis watch. She then spoke to her supervisor, and a male counselor helped Lipscomb write a grievance. The Court finds Strong's testimony regarding Lipscomb's access to grievances and her interactions with Lipscomb to be credible.

Finally, the evidence in the record clearly indicates that Lipscomb had access to grievances. He submitted a grievance on July 6, 2023, just prior to the events giving rise to his claims (Doc. 47, p. 17). Further, the grievance log notes that he submitted three grievances in June 2023, five grievances in July 2023, and the three grievances in August 2023 (Doc. 41-3, p. 4). His counseling notes also indicate that he was seen on tour by Counselor Strong on July 12, 2023, July 27, 2023, and August 8, 2023 (Doc. 41-5, pp. 4-5), but there is simply no indication that he requested help filing a grievance. Nor did he request grievance forms. There is no evidence to support Lipscomb's claim that he was thwarted in his ability to file a grievance regarding his claims. Thus, Lipscomb failed to exhaust his administrative remedies prior to filing his lawsuit.

## CONCLUSION

For the reasons stated above, the summary judgment motions filed by Jilian Crane, Tera Wilkes (Docs. 40, 41) and Lance Korando (Docs. 43, 44) are **GRANTED**. Lipscomb's claims are **DISMISSED without prejudice** due to his failure to exhaust his administrative remedies prior to filing his lawsuit.

The Clerk of Court is **DIRECTED** to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

**DATED:  February 24, 2025**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**